IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


THOMAS N. PIERZCHALSKI                                              PLAINTIFF

             v.                          Civil No. 08-3065

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                      DEFENDANT

## MEMORANDUM OPINION

## I.    Factual and Procedural Background

Plaintiff, Thomas N. Pierzchalski, appeals from the decision of the Commissioner of the

Social Security Administration ("Commissioner") denying his applications for disability insurance

benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(i) and 223

of Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and § 1602 of Title XVI, 42

U.S.C. § 1381a, respectively (collectively, "the Act").

At the time of the alleged onset date, Plaintiff was thirty three years old and possessed a high

school diploma.  (Tr. 111).  He performed past relevant work as a metal fabricator.  (Tr. 18).

Plaintiff filed his DIB application on March 28, 2006, alleging a disability onset date of April 8,

2005, due to chronic back and neck pain.  (Tr. 34-35, 46, 102, 106).  He subsequently filed his SSI

application on August 21, 2007, which was escalated to the hearing level.  (Tr. 10).

Plaintiff's applications were denied at the initial and reconsideration levels.  (Tr. 37-41).  At

Plaintiff's request, an administrative hearing was held on February 26, 2008. (Tr. 236-55).  Plaintiff

was present at this hearing and represented by counsel.  The Administrative Law Judge (ALJ)

rendered an unfavorable decision on June 25, 2008, finding that Plaintiff was not disabled within the

meaning of the Act because he was capable of performing one or more occupations existing in significant numbers in the national economy.[1]  (Tr. 7-19).  Plaintiff submitted additional evidence on August 5, 2008.  (Tr. 6).  Subsequently, the Appeals Council denied Plaintiff's Request for Review on October 8, 2008, thus making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5).  Plaintiff now seeks judicial review of that decision.

## II.   Medical History

### A.  Mountain Home Family Chiropractic

On April 8, 2005, Plaintiff was lifting a steel door frame at work when he felt a pulling sensation in the back of his neck and shoulder region followed by the onset of pain.  (Tr. 125). Between April 15, 2005 and April 20, 2005, Plaintiff went to Charles Osgood, D.C., complaining of pain in his neck and upper right back.  (Tr. 114).  Dr. Osgood opined that "the patient's condition is acute."  (Tr. 114).  After employing ultrasonic therapy, adjustments, and intersegmental mobilization, Dr. Osgood noted:

> A left lateral malposition if [sic] observed at C6.  The third thoracic vertebra is misaligned left lateral.  The L5 segment is shifted right lateralward.  Palpation of the left SI joint showed a posterior ilium.  On palpation, the paraspinal muscles demonstrated a severe degree of hypertonic contraction in the cervical paraspinal muscles bilaterally and upper thoracic muscles bilaterally.  Spinal examination was carried out by palpation and inspection.  There was a severe pain intensity at C6 and T3 bilaterally.

(Tr. 115).  Results of a static EMG scan revealed severe tension at C1(R), C3(L), C5(L), T2(R), T4(L), T4(R), and T6(R), moderate tension at C3(R), T6(L), T10(R), L5(L), and S1(L), mild tension at C7(R), T2(L), and L3(L), and significant asymmetry at C1(R), C3(L), C5(L), C7(R), T2(R),

---

[1] After hearing testimony from a vocational expert, the ALJ determined that Plaintiff could perform work at the light, unskilled level.  A representative occupation is cashier II, DOT # 211.462-010, of which there are 9,000 jobs locally and 1,149,000 nationally.  (Tr. 253-54).

T4(R), T10(R), L1(L), L3(L), L5(L), and S1(L).  (Tr. 117).  Dr. Osgood diagnosed Plaintiff with

Cervicobrachial syndrome, Neuralgia Neuritis NOS, and cervical and thoracic somatic dysfunction.

(Tr. 199-120).

    B.  <u>Regional Orthopaedic Health Care</u>

    On April 26, 2005, Plaintiff saw Dr. Anthony McBride, an orthopaedic surgeon, with

complaints of neck pain.  (Tr. 125).  Dr. McBride noted no history of similar accidents except a prior

whiplash injury sustained in a car accident twelve years earlier.  (Tr. 125).  Upon examination,

Plaintiff had limited flexion, extension, and rotation in his neck and had a positive Spurling's

maneuver.  (Tr. 125).  Results of an MRI done on May 4, 2005 indicated early degenerative changes,

but no definite evidence of a frankly herniated pulposus.  (Tr. 124).  Dr. Kyle McAliser read the MRI

results and noted:

> There is some thickening of the posterior spinous ligament but it is not definitely
> calcified.  This is not causing marked central canal or neuroforaminal stenosis but it
> does efface some of the CFS anterior to the cord and there is mild narrowing of the
> neuroforamina on the right side at the C5-6 and C6-7 levels secondary to this
> thickening and mild bulging of the discs with bony spurring.  The most pronounced
> bulging disc is at the C6-7 level; it does indent the thecal sac slightly eccentric to the
> right.

(Tr. 124).  Based on these results, Dr. McBride diagnosed a disc herniation at C6-7 and stated "there

is no question in my mind that this is causing his right shoulder and arm pain."  (Tr. 123).  It was his

opinion that Plaintiff would require a discectomy and fusion.  (Tr. 123).

    C.  <u>Little Rock Spine and Joint Clinic</u>

    On May 11, 2005, Plaintiff saw Dr. Darin K. Wilbourn, a specialist in physical medicine and

rehabilitation, complaining of sharp pain beginning in his right neck and radiating down his right

arm, numbness in his right hand, and trouble sleeping.  (Tr. 174).  Dr. Wilbourn reviewed Plaintiff's

MRI results and confirmed bulging discs at C5-6 and C6-7 with narrowing of the neural foramen on the right. (Tr. 174). Dr. Wilbourn recommended epidural steroid injections and referred Plaintiff to Dr. Spence for physical therapy three times a week for two weeks. (Tr. 175). He also prescribed Sterapred, Soma, and Lorcet and instructed that Plaintiff remain off work in the meantime. (Tr. 175). On August 19, 2005, after Plaintiff had completed some physical therapy and received two steroid injections at White County Medical Center, Dr. Wilbourn noted that "his cervical spine continues to have limited range of motion in all planes secondary to increased pain with these maneuvers. His joints have full active range of motion bilateral upper extremities. Sensation is intact bilateral upper extremities." (Tr. 163). As a result, Dr. Wilbourn recommended that Plaintiff get fitted for an RS Medical Sequential Muscle Stimulator and proceed with surgery. (Tr. 160).

D.  Dr. Barry D. Baskin

On August 9, 2005, Plaintiff saw Dr. Baskin, a specialist in physical medicine and rehabilitation. (Tr. 186). After reviewing Plaintiff's MRI, he noted thickening of the posterior longitudinal ligament in the C5, 6, and 7 area with no frank calcification. (Tr. 186). He also noted a bulge at C6-7 and slight protrusion into the left lateral recess, possibly causing some compromise of the neuroforamen. (Tr. 186). After instructing Plaintiff how to do home exercise and traction properly, Dr. Baskin referred him to Baptist Health Medical Center for a better quality MRI. (Tr. 184). Results of this MRI revealed a broad based disc bulge at C6-7, but no evidence of any substantial foraminal stenosis. (Tr. 184). With respect to Plaintiff's ability to work, Dr. Baskin stated, "I think that we need to get Mr. Pierzchalski back to work . . . he will probably have some minimal impairment but should be at a point of maximum medical improvement very soon given that he does not have a disc herniation." (Tr. 184).

-4-

In a letter dated February 18, 2006, after reviewing Plaintiff's medical records, Dr. Baskin stated, "Since all of the tests have been negative with the exception of minimal disc bulging at C5-6 and 6-7 both more prominent to the right side, it would appear that no surgery is indicated in this gentleman's case." (Tr. 176). Dr. Baskin further noted:

> I do not see the need to reevaluate Mr. Pierzchalski at this time. There are not any objective findings in my opinion to support continued treatment and off work status at this time. Mr. Pierzchalski, in my opinion, should be at maximum medical improvement at this point with regard to his neck pain and reported neck injury. Mr. Pierzchalski should be able to return to full work duty with no restrictions. Given the fact that he does not have evidence of radiculopathy by EMG and nerve conduction studies and that by myelogram and post myelogram CT scan he is not felt to be in need of surgery, I think he can return to work and be at maximum medical improvement. . . Using the AMA Guidelines Fourth Edition, page 113, table 75, category IIB, Mr. Pierzchalski would have a 5% impairment rating to the whole person based on unoperated stable medically documented neck injury and pain with associated rigidity with none to minimal degenerative changes on structural tests such as those involving MRI or CT myelogram . . .This patient's complaint of left upper extremity pain is not consistent with a disc bulging at C5-6 or 6-7 to the right side of the cervical spine.

(Tr. 176-77).

E.  <u>Baptist Health Medical Center</u>

On August 12, 2005, Plaintiff was referred to Baptist by Dr. Baskin for an MRI of his cervical spine. Results indicated a small central disc bulge at C2-3 with no effacement of the canal, a mild bulge at C5-6 but no disc herniation at this level, and a broad-based small to medium-sized disc bulge at C6-7 extending to the entrance of the right neural foramen. (Tr. 181). "This does not induce right foraminal stenosis but with axial loading there could be a mild degree of narrowing induced in which case the right C7 root could be compressed at the entrance to the right foraminal tunnel. This is not demonstrated on this examination." (Tr. 181).

Results of another MRI performed on November 2, 2005, indicated minimal posterior

osteophytic ridging with disc bulge assymetric to the right at the C5-6 and C6-7 levels, but no significant central stenosis was appreciated. (Tr. 179). Mild foraminal narrowing was noted on the right at C5-6 and C6-7, but overall the cervical spine was "grossly unchanged from the prior examination." (Tr. 179).

      F.   <u>Neurological Surgery Associates</u>

On September 6, 2005, Plaintiff saw Dr. J. Zachary Mason, a neurosurgeon, upon referral from Dr. Wilbourn. (Tr. 132). After reviewing Plaintiff's medical records, Dr. Mason noted a right C6-7 disc herniation with nerve root compromise and recommended an anterior cervical discectomy, arthrodesis and plating at C6-C7. (Tr. 133).

      G.   <u>Functional Testing Centers</u>

On September 15, 2005, Plaintiff underwent a series of functional testing at the request of Dr. Baskin. (Tr. 134-44). Testing was administered by Rick Byrd, a Certified Senior Disability Analyst. Byrd's notes indicate that Plaintiff "put forth very inconsistent effort with functional testing." (Tr. 134). For instance, Plaintiff demonstrated significant cervical active range of motion ("AROM") deficits with formal testing yet demonstrated only 10-15% gross limitation when performing other functional tasks. (Tr. 134). Furthermore, Plaintiff demonstrated a very guarded stiffness of the cervical region during his intake interview and then proceeded to frequently roll his neck in all planes during functional aspects of testing with minimal range of motion deficits. (Tr. 134). Overall, Byrd determined that Plaintiff's evaluation yielded "unreliable results with inappropriate pain behaviors." (Tr. 135).

Given Plaintiff's limitations, Mr. Byrd found that he could perform work in the medium category over the course of an eight-hour workday, with occasional lifting of 21-50 pounds, frequent

lifting of 11-25 pounds, and constant lifting of 1-10 pounds.  (Tr. 135).  Mr. Byrd also found that Plaintiff could perform the following activities on a constant basis: walking and all general mobility tasks, handling (both hands), bi-manual handling, fingering (both hands), bi-manual fingering, sitting, and standing.  (Tr. 135).  Additionally, Plaintiff could frequently carry and could perform immediate and overhead reaching with his left arm, but demonstrated poor tolerance with his right arm during formal testing.  (Tr. 135-36).  Mr. Byrd found no limitations regarding climbing, balancing, stooping, kneeling, and crouching.  (Tr. 136).

H.  Arkansas Specialty Spine Center

On December 2, 2005, Plaintiff saw Dr. Edward H. Saer, an orthopedic spinal surgeon.  (Tr. 157).  Dr. Saer reported that Plaintiff was not currently taking any medications and smokes a pack of cigarettes daily.  (Tr. 125, 158, 174, 190).  After reviewing the November MRI results from Baptist, Dr. Saer confirmed "a small right foraminal disc protrusion at C5-6 and a small bulge at C6-7 on the right as well.  Both have slight desiccation."  (Tr. 158).  Dr. Saer was of the opinion that surgery was not a good option for Plaintiff and would likely be unhelpful, as "his disc abnormalities are pretty minimal."  (Tr. 158).  Dr. Saer prescribed hydrocodone, Skelaxin and Ambien.  (Tr. 159).

On December 19, 2005, Dr. Reginald J. Rutherford, a neurologist, performed electrodiagnostic testing of Plaintiff's right arm.  (Tr. 155).  The EMG report indicated crepitus and restricted range of motion in the cervical spine as well as restricted range of motion of the right shoulder, but no neurological defects.  (Tr. 155).

On January 17, 2006, Plaintiff was evaluated by Dr. Charles E. Pearce, Jr., an orthopaedic surgeon.  (Tr. 151-52).  Results of an MRI (without contrast) of Plaintiff's right shoulder revealed rotator cuff tendinosis and a small paralabral cyst, which Dr. Pearce believed to be incidental only

and non-contributory to Plaintiff's pain. (Tr. 151). Dr. Pearce found Plaintiff's right shoulder pain

to be muscular in origin, and saw no reason to further restrict him from activity. (Tr. 152).

On February 9, 2006, Plaintiff had a myelogram and post-myelogram CT (with contrast) of

his cervical spine performed at St. Vincent Health System. (Tr. 147-49). The cervical myelogram

yielded findings of disc bulges at C5-6 and C6-7, with subtle lateral defects on the right at C5-6 and

on the left at C6-7 and to a lesser extent on the right at C6-7. (Tr. 149). On the CT, broad-based disc

bulges were noted at C5-6 and C6-7, both slightly asymmetric and more prominent on the right side,

with some projection into the neural foramen region at C6-7. (Tr. 147). After reviewing these

reports, Dr. Saer stated:

> I just do not think that the C6-7 level is the cause of his problems. It just does not
> look like it is significant enough to be causing all the trouble he is having. . . I think
> his problem is most likely a soft tissue one. I do not think that surgery on his neck
> is likely to be particularly helpful. I would recommend that he pursue further
> nonoperative management for this.

(Tr. 150).

I. Physicians Medical Center of the Ozarks

On April 18, 2006, Plaintiff saw Dr. Hicham S. Merheb with complaints of neck, shoulder,

and arm pain as well as tingling and burning in his right hand. (Tr. 190). Upon physical

examination, Dr. Merheb found disc bulging in the cervical spine and myelopathy of C6-7. (Tr. 191-

92). Dr. Merheb diagnosed Plaintiff with cervical spondylosis and radiculopathy, and recommended

a cervical epidural steroid injection and a consultation with a neurosurgeon. (Tr. 192). In a residual

functional capacity questionnaire ("RFC") dated May 1, 2006, Dr. Merheb indicated that it was

impossible to give a complete assessment based on one office visit. (Tr. 194).

J. <u>DDS Evaluation</u>

In a physical RFC assessment dated June 5, 2006, Alice Davidson determined that Plaintiff suffers from degenerative disc disease of the cervical spine.  (Tr. 199-206).  With Plaintiff's impairments, Davidson found that he could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, push and/or pull an unlimited amount (other than as shown for lift and/or carry), and stand, walk, or sit for a total of about six hours in an eight-hour workday.  (Tr. 200). With regard to Plaintiff's manipulative limitations, she found that he was limited in his ability to reach in all directions, but was not limited with regard to handling, fingering, and feeling. (Tr. 202). Davidson further found no postural, visual, communicative, or environmental limitations.  (Tr. 200-03).

K. <u>Neurosurgical Associates of Northeast Arkansas</u>

On October 30, 2006, Plaintiff saw Dr. Rebecca Barrett-Tuck, a neurosurgeon.  (Tr. 231-31). Dr. Barrett-Tuck reviewed Plaintiff's medical file, including the discrepancy in Dr. Mason and Dr. Saer's opinions regarding the benefits of surgery.  (Tr. 231).  After ordering a new MRI, Dr. Barrett-Tuck stated:

> At this time, my feeling is that really neither of the opinions that were given are right or wrong, certainly Mr. Pierzchalski has had extensive conservative treatments and I understand that he does have a small disc protrusion and that it is possible that surgery will benefit him.  On the other hand, the protrusion is small and there is a possibility that it will not benefit him.  I will be seeing Mr. Pierzchalski back the day of his follow-up MRI.  I will review it and make [a] definitive recommendation thereafter.

(Tr. 231).  It appears from the medical evidence that Plaintiff did not obtain a follow-up MRI or appointment with Dr. Barrett-Tuck.

L.  S.I.U., Inc.

On September 24, 2007, Plaintiff had digital motion x-rays of his cervical spine taken by Keith Currie, D.C.  (Tr. 213-16).  Results were interpreted by John Postlethwaite, D.C. and submitted in a report dated February 14, 2008. (Tr. 213-16).  Dr. Postlethwaite made the following findings: damage to the posterior longitudinal ligament as indicated by anterolisthesis at C4-5 and C5-6, damage to the interspinous ligament as evidenced by a separation between C5-6 and C6-7 spinous processes, damage to the anterior longitudinal ligament as indicated by retrolisthesis at C3-4, damages to the capsular ligament as indicated by gapping of the facet joint at C6-7 on the right and intervertebral foraminal encroachment of the facet joint at C3-4 and C4-5 bilaterally, and damage to the alar and accessory ligaments, as indicated by a significant overhang of the lateral mass of C1 bilaterally.  (Tr. 216).

M.  Dr. Vann Smith

On March 7, 2008, Plaintiff was evaluated by Dr. Vann Smith, a neuropsychologist.  (Tr. 218-21).  Upon evaluation, Dr. Smith noted that Plaintiff has "a history of emerging and slowly worsening neurocognitive symptoms," including: (1) affective lability; (2) word finding difficulty; (3) sleep pattern disturbance; and (4) episodic dysexecutivism. (Tr. 218).  However, Dr. Smith found Plaintiff to be alert, cooperative, and oriented in all spheres. (Tr. 218).  His memory, judgment, and insight were intact. (Tr. 218-19).  His narratives were logical and informative, without evidence of associational anomaly. (Tr. 219).  His intelligence was estimated to lie within the normal range. (Tr. 218-19).  On the Wechsler Adult Intelligence Scale, Revised edition, Plaintiff obtained a verbal score of 104, a performance score of 104, and a full-scale IQ of 103, indicating functioning within the average range. (Tr. 219).  On the Reitan Indiana Aphasia Screen, Plaintiff yielded results associated

with constructional dyspraxia.[2]  (Tr. 219).  After administering a battery of neuropsychological tests,

Dr. Smith diagnosed Plaintiff with cognitive dysfunction[3], non-psychotic, secondary to degenerative

disc disease and chronic, multi-focal, non-psychogenic pain disorder.  (Tr. 221).  Concerning

Plaintiff's cognitive functioning, Dr. Smith stated:

> In overview, this patient's clinical history, mental status examination and neuropsychodiagnostic screening test profile data reveal a pattern of abnormal responses and pathgnomonic indices consistent with the presence of diffuse organic brain dysfunction of mild to moderate severity and slowly progressive velocity.

(Tr. 220).

Dr. Smith also completed a Mental RFC Questionnaire on March 11, 2008, indicating that

Plaintiff had a current Global Assessment of Functioning ("GAF") score of 45.[4]   (Tr. 222).

Concerning Plaintiff's ability to perform semi-skilled and skilled work, Dr. Smith found that

Plaintiff would be unable to meet competitive standards in the areas of understanding, remembering,

and carrying out detailed instructions, setting realistic goals or making plans independently of others,

and dealing with work stress, and was seriously limited, but not precluded in his ability to travel to

unfamiliar places and use public transportation.  (Tr. 224-25).  Dr. Smith further found that Plaintiff

was unable to meet competitive standards in unskilled work because he could not remember work-

---

[2] Constructional Dyspraxia is characterized by problems understanding and establishing spatial relationships.  i.e. moving objects from one place to another.  National Center for Learning Disabilities, *Dyspraxia: A Quick Look, available at* http://www.ncld.org/ld-basics/ld-aamp-language/ld-aamp-handwriting/dyspraxia-a-quick-look (last visited March 1, 2010).

[3] The essential feature of this condition is the development of impairment in neurocognitive functioning due to a general medical condition.  Individuals with this condition have a new onset of deficits in at least two areas of cognitive functioning, including disturbances in memory, executive functioning, attention or speed of information processing, perceptual motor abilities, or language.  "The cognitive deficits cause marked distress or interfere with the individual's social, occupational, or other important areas of functioning and represent a decline from a previous level of functioning."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 762 (4th ed., 2000).

[4] A GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.* at 34.

like procedures, maintain attention for a two hour segment, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 224). Dr. Smith found that Plaintiff was seriously limited, but not precluded in his ability to maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without being unduly distracted, respond appropriately to changes in a routine work setting, deal with normal work stress, and be aware of normal hazards and take appropriate precautions. (Tr. 224). Plaintiff's abilities were limited but satisfactory in all other categories. (Tr. 224-25). Dr. Smith estimated that Plaintiff would miss more than four workdays a month as a result of his mental impairments. (Tr. 225).

## III.   **Applicable Law**

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

## IV.   Discussion

The ALJ made the following findings: (1) Plaintiff meets the insured status requirements of the Act through December 31, 2010; (2) Plaintiff has not engaged in substantial gainful activity since April 8, 2005, the alleged onset date; (3) Plaintiff has the following severe impairment: degenerative disc disease in his cervical spine; (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one or more of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (5) Plaintiff can occasionally lift and/or carry 20 pounds, frequently lift and/or

carry 10 pounds, push and/or pull within the limits given for lifting and carrying, stand, walk, and /or sit (with normal breaks) for about six hours in an eight-hour workday, and occasionally do overhead work; (6) Plaintiff is unable to perform any past relevant work; (7) Plaintiff was born on July 28, 1971, and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date; (8) Plaintiff has at least a high school education and is able to communicate in English; (9) Plaintiff has transferable skills to the light exertion level; (10) Given Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; and therefore, (11) Plaintiff has not been under a disability, as defined in the Act, from April 8, 2005, through the decision date.  (Tr. 12-19).

Plaintiff contends that the ALJ erred in: (1) failing to find Plaintiff's physical and mental impairments to be severe; (2) failing to find that Plaintiff's impairments meet or medically equal listings 12.02 and/or 12.05C; (3) failing to give proper weight to the opinion of Plaintiff's neuropsychologist, Dr. Vann Smith; and (4) failing to fully and fairly develop the record as to Plaintiff's mental impairments.  *See* Pl.'s Br. 8-27.

A. Plaintiff's Severe Impairments

Plaintiff contends the ALJ erred at step two of the sequential analysis by failing to find "any" of his alleged mental and physical impairments to be severe.  *See* Pl.'s Br. at 10.  Specifically, Plaintiff directs our attention to his diagnoses of a herniated disc and cognitive dysfunction.  *See* Pl.'s Br. 10-19.  For reasons outlined below, we disagree with Plaintiff's assertion and find that substantial evidence supports the ALJ's determination at this stage.

Step two of the regulations involves a determination, based on the medical evidence, whether the claimant has an impairment or combination of impairments that is severe.  *See* 20 C.F.R. §§

404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is one which significantly limits a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have "no more than a minimal impact on her ability to work." *Caviness v. Massanari,* 250 F.3d 603, 605 (8th Cir.2001), *citing Nguyen v. Chater,* 75 F.3d 429, 430-31 (8th Cir.1996). Although the Plaintiff has the burden of establishing a severe impairment or impairments, the burden at this stage is not great. *Caviness*, 250 F.3d at 605.

Contrary to Plaintiff's assertion, the ALJ found Plaintiff's degenerative disc disease to be a severe impairment. (Tr. 12). As for Plaintiff's other alleged physical impairments, the medical evidence concerning a herniated disc is conflicting. Drs. McBride and Mason noted a right-sided C6-7 disc herniation, which they believed to be the cause of Plaintiff's pain. (Tr. 123, 133). On the other hand, Dr. Baskin's records as well as the MRI findings from Baptist Health showed "no evidence of any significant disc herniation." (Tr. 181, 184). Additionally, Drs. Saer and Fenton noted a disc bulge at C6-7, but neither physician diagnosed a frankly herniated nucleus pulposus ("HNP"). (Tr. 147, 150, 158, 160). Dr. Saer was of the opinion that Plaintiff's pain derived from a soft tissue injury, noting that "his disc abnormalities are pretty minimal." (Tr. 150, 158). Moreover, Dr. Wilbourn's "Treating Physician Progress Report" mentions a HNP in connection with Plaintiff's temporary leave from work, but his treatment notes indicate bulging discs at C5-6 and C6-7 with no specific mention of a herniated disc. (Tr. 160-75).

Plaintiff's physicians also disagreed on the necessity of surgery. Drs. McBride and Mason believed a discectomy and fusion would benefit Plaintiff, while Drs. Baskin and Saer found that nonoperative measures would be more effective. (Tr. 123, 133, 150, 158, 176). It is the function of

-15-

the ALJ to weigh conflicting evidence and to resolve disagreements among physicians.  *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (citing *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002)).  Here, it is evident from Plaintiff's medical records that he suffers from degenerative disc disease of the cervical spine.  Evidence of a herniated disc, however, is much less certain.  For these reasons, we find no error in the ALJ's determination as to Plaintiff's physical impairments.

Similarly, we find no error in the ALJ's determination that Plaintiff's cognitive dysfunction is non-severe.  The ALJ provided explicit reasons for giving little weight to Dr. Vann Smith's mental evaluation, namely that Dr. Smith's opinion is inconsistent both internally and as compared with the medical evidence as a whole.  (Tr. 13).  Furthermore, the ALJ concluded that Dr. Smith relied heavily and unquestioningly on the Plaintiff's subjective report of his symptoms, which the ALJ properly found to be unreliable.  (Tr. 13).  Finally, the ALJ noted that Plaintiff had never before sought medical treatment from a  neuropsychologist, and surmised that this was an attempt to generate evidence for the current appeal.  (Tr. 13).  Accordingly, the ALJ determined that Plaintiff's cognitive dysfunction has no more than a minimal impact on his ability to work and is non-severe under that Act.  (Tr. 13).

Substantial evidences supports this determination.  Dr. Smith, who evaluated Plaintiff only once, diagnosed him with cognitive dysfunction, non-psychotic, secondary to general medical condition.  (Tr. 221).  However, in his own treatment notes, Dr. Smith indicated that Plaintiff was alert, cooperative, oriented in all spheres, and his memory, judgment, and insight were intact.  (Tr. 218-19).  Dr. Smith further stated that Plaintiff's narratives were logical and informative, without evidence of associational anomaly, and his thought processes were abstract to functional in quality.

-16-

(Tr. 218-19).   These observations are seemingly inconsistent[5] with a diagnosis of cognitive dysfunction, since the hallmark of this condition involves disturbances in the individual's memory, executive functioning, information processing, and word-finding abilities.  *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 764 (4th ed., 2000).  Furthermore, Plaintiff did not allege cognitive dysfunction in his disability report nor did he seek treatment from a neuropsychologist prior to his consultation with Dr. Smith.  *See Page v. Astrue,* 484 F.3d 1040, 1043 -44 (8th Cir. 2007); *Shannon v. Chater,* 54 F.3d 484, 486 (8th Cir.1995) (doctor's visit linked primarily to obtaining benefits rather than medical treatment)).  Finally, in an Adult Function Report completed by Plaintiff's girlfriend, she indicated that Plaintiff enjoys extensive reading, has an "excellent attention span," and handles stress "better than [an] average person."  (Tr. 87).  These findings are simply inconsistent with a diagnosis of disabling cognitive dysfunction.  For these reasons, we find that the ALJ's determination regarding Plaintiff's severe impairments is supported by substantial evidence.

B.  Listings

Plaintiff argues that the ALJ erred at step three in failing to find that Plaintiff's combined impairments meet or equal a listed impairment.  Specifically, Plaintiff asserts that he meets the medical equivalence requirements of Listings 12.02 (organic mental disorders) and 12.05C (mental retardation).  *See* Pl.'s Br. at 11.  Plaintiff's argument is without merit.

First, Plaintiff's argument is conclusory, as he has provided no evidence that he meets the specified criteria for either listing.  *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005)

_____

[5] The court takes note of Dr. Smith's affidavit concerning the internal consistency of his findings, but finds it to be unpersuasive for the reasons cited above.  (Doc. #9).

("We reject out of hand Vandenboom's conclusory assertion that the ALJ failed to consider whether he met listings 12.02 or 12.05C because Vandenboom provides no analysis of the relevant law or facts regarding these listings.")).  There is no evidence in the record suggesting that Plaintiff suffers from mental retardation.  To the contrary, Plaintiff successfully completed high school and reportedly attended one semester of college.  (Tr. 218).  Furthermore, Plaintiff received a verbal IQ of 104, a performance IQ of 104, and a full-scale IQ of 103 on the Wechsler Adult Intelligence Scale, Revised edition, indicating intellectual functioning within the average range.  (Tr. 219).

With respect to Plaintiff's alleged organic mental disorder, the one-time evaluation of Dr. Smith has been fully addressed above.  When considering Plaintiff's combined impairments, both severe and non-severe, the ALJ found that he has no restriction of activities of daily living, no difficulty in maintaining social functioning, persistence or pace, and has experienced no episodes of decompensation, each of extended duration.  (Tr. 13).  This finding is consistent with the medical evidence of record and does not support Plaintiff's assertion that he meets Listing 12.02.  Accordingly, the ALJ properly determined that Plaintiff's impairments do not meet or equal the criteria for listings 12.02 or 12.05C.

C.  Treating Physician

Plaintiff next asserts that the ALJ demonstrated bias in weighing and dismissing Dr. Smith's opinion.  *See* Pl.'s Br. 19-23.  A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a clamant's record.  *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2).  The record must be evaluated as a whole to determine whether the treating physician's opinion should be controlling.  *Reed v. Barnhart*, 399 F.3d

917, 920 (8th Cir. 2005). A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21 (quoting *Prosch*, 201 F.3d at 1013). In any case, an ALJ must always "give good reasons" for the weight afforded to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

The ALJ gave specific reasons for the weight given to Dr. Smith's opinion. First, Dr. Smith evaluated Plaintiff only on one occasion. The assessment of a doctor who evaluates a claimant once or not at all does not usually constitute substantial evidence. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). Furthermore, as previously discussed, the ALJ properly determined that Dr. Smith's findings were internally inconsistent as well as inconsistent with the medical evidence as a whole. (Tr. 13). Plaintiff had never before sought treatment for or exhibited symptoms consistent with cognitive dysfunction. *See Kirby v. Astrue*, 500 F.3d 705, 708-09 (8th Cir. 2007). It appears that Plaintiff saw Dr. Smith to bolster his claim for disability benefits rather than to obtain medical treatment. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995). The ALJ properly took these considerations into account when determining what weight to give Dr. Smith's opinion.

The court also dismisses Plaintiff's claim of unfair bias or prejudice exhibited by the ALJ against Dr. Smith. In considering Dr. Smith's opinion, the ALJ specifically stated, "such evidence is certainly legitimate and deserves due consideration." (Tr. 13). Moreover, Plaintiff has offered no specific evidence of bias. *See Kittler v. Astrue*, 231 Fed. Appx. 524, 525 (8th Cir. 2007) (citing *Rollins v. Massanari*, 261 F.3d 853, 857-58 (8th Cir. 2001) (plaintiff did not overcome presumption that ALJ was unbiased)). Accordingly, we reject Plaintiff's conclusory allegation of prejudice.

D.  Duty to Fully and Fairly Develop the Record

In his final argument, Plaintiff contends the ALJ failed to fully and fairly develop the record concerning his mental impairments.  *See* Pl.'s Br. 23-26.  We disagree.

The ALJ has a duty to fully and fairly develop the record, even if a claimant is represented by counsel.  *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998).  "It is well-settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician.  *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000).  While the Secretary is under no duty to go to inordinate lengths to develop a claimant's case, he must "make an investigation that is not wholly inadequate under the circumstances."  *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (quoting *Miranda v. Secretary of Health, Educ. & Welfare*, 514 F.2d 996, 998 (1st Cir. 1975)).  There is no bright-line test for determining when the Secretary has failed to adequately develop the record; the determination must be made on a case by case basis.  *Battles*, 36 F.3d at 45 (quoting *Lashley v. Secretary of Health & Human Serv.,* 708 F.2d 1048, 1052 (6th Cir.1983)).

We find that the ALJ satisfied his duty to fully and fairly develop the record.  An ALJ is not obliged "to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability."  *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (citing *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)).  As earlier discussed, Plaintiff had no history of mental health treatment and had never before exhibited symptoms associated with cognitive dysfunction.  Plaintiff reportedly enjoys extensive reading, has no problems with attention, concentration or following instructions, and handles stress better than an average person.  (Tr. 86).  As such, the circumstances here do not warrant further investigation into Plaintiff's alleged mental

impairment.  The court finds that the ALJ had sufficient evidence to make a fully informed decision as to Plaintiff's disability.

### V.    <u>Conclusion</u>

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed.  Accordingly, Plaintiff's complaint should be dismissed with prejudice.

ENTERED this 4th day of March 2010.


/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE